773 P.2d 467

**ROTARY CLUB OF TUCSON and Rotary Club of Tucson Foundation, Inc., Plaintiffs/Appellees/Cross–Appellants,**

v.

**Ana Catalina CHAPRALES RAMOS de PENA and Maria Josefina Chaprales Ramos de Agnesi as Personal Representatives for the Estate of Maria Valentina Josefina Ramos VDA de Chaprales,                    Defendants/Appellants/Cross–Appellees.**

No. 2 CA–CV 88–0178.

Court of Appeals of Arizona,
Division 2, Department A.

Jan. 10, 1989.

Reconsideration Denied Feb. 14, 1989.

Review Denied June 6, 1989.

Molloy, Jones & Donahue, P.C. by John F. Molloy and Janet C. Bostwick, Tucson, for plaintiffs/appellees/cross-appellants.

O'Connor, Cavanagh, Hecker, Phillips & Hooker by Glenda E. Edmonds, Tucson, for defendants/appellants/cross-appellees.

## OPINION

HOWARD, Judge.

This is an appeal from the granting of a summary judgment holding that a Mexican judgment was not entitled to recognition by the Arizona courts. Appellees have filed a cross-appeal which will be discussed later in this decision.

## FACTS

The facts considered in the light most favorable to appellants are as follows. On December 3, 1980, Maria Valentina Josefina Ramos Vda. de Chaprales (decedent) executed a will which provided, inter alia:

> The rights which may belong to me over the residence located in Palm Tree Drive 9010 in Tucson, Arizona, E.U.A., shall be transferred to some Rotary Club of said city, for the social welfare purposes for people of scarce economic resources in the Mexican colony of said place.

She sold the Palm Tree Drive property on October 15, 1981, and took back a promissory note secured by a deed of trust for $34,101.35. On July 1, 1983, the decedent died in Culiacan, Mexico. Monthly payments were paid into the bank account with the final payment of $29,428.48 being paid

in September 1986. The payments totaled $49,684.87.[1]

In October 1983, the daughter and son-in-law of decedent, Ana Catalina Chaprales Ramos de Pena and Jose Eleazer Pena, came to Tucson and met with Larry Adamson, a member of the Rotary Club of Tucson and president of the Rotary Club of Tucson Foundation. The Penas informed Adamson that the proceedings in Mexico would take an extra two years unless the Rotary Club in Tucson informed the Family Law Court in Culiacan that they had received a notice that Mrs. Chaprales had died. Raymond Terlizzi, president of the Rotary Club of Tucson at that time, and Adamson signed a document granting Serapio Lopez Insunza limited special powers to appear in the Mexican court "for the purposes of accepting or repudiating legacies and to vote for the designation of an executor of the Estate of Josefina Ramos de Chaprales." At the time of executing the Insunza authorization, Adamson knew that Insunza was the personal attorney for Ana Pena whom he also knew to be the daughter of the decedent and beneficiary of 20 percent of the decedent's estate. Adamson also knew that Insunza was representing other devisees and beneficiaries of the decedent in the probate proceeding pending in the Mexican court.

The Rotary Club of Tucson did not authorize Insunza to generally represent them in the proceedings before the Mexican court. In fact, Adamson believed he was giving Insunza power of attorney only to appear before the Mexican court to acknowledge that the Rotary Club of Tucson had received notice that Chaprales had died. Terlizzi understood that they were giving Insunza authority only for the purpose of accepting or repudiating a legacy or inheritance.

On November 25, 1983, the Mexican court declared the decedent's will to be valid. On February 16, 1984, the Mexican court issued a summons to all legatees

---

**1.** Contrary to the common law of ademption, A.R.S. § 14–2608(A) provides that the devisee of specifically devised property has the right to the unpaid proceeds of real property which has been sold prior to death.

under the will of Chaprales to appear within six days of notification and establish their legal capacity to inherit. The court record indicates that Insunza received the summons on behalf of the Tucson Rotary Club. None of the eight rotary clubs in Tucson received the summons.

On March 29, 1984, the Mexican court granted a motion to strike the Rotary Club of Tucson from the list of legatees due to their failure to appear to establish their legal capacity to inherit. Adamson did not learn of the Mexican court's ruling until more than 20 months later when he received from Insunza a letter informing him that the Mexican court had decided that the Rotary Club of Tucson was not a qualified legatee.

On May 7, 1986, the co-personal representatives filed in the Pima County Superior Court a "Submission of Certified Copy Appointment of Domiciliary Foreign Co-personal Representatives and Translation of the Original in Spanish" pursuant to A.R.S. §§ 14-4204 and 14-4205. The Rotary Club of Tucson then filed a "Petition for Determination of Testacy and Nonremoval of Assets From This Jurisdiction."

In the course of litigation it was discovered that all the funds paid into the bank accounts pursuant to the sale of the Palm Tree Drive property were withdrawn by the appellants and were used to redeem a delinquent deed of trust for a townhouse owned by the decedent described as Lot 71, Townhomes at El Dorado, Tucson, Arizona.

Both parties moved for summary judgment in the trial court. The trial court denied appellants' motion for summary judgment, and granted appellee's motion for summary judgment ruling that letters of trusteeship should be issued to the Rotary Club of Tucson as trustee under the last will and testament of the decedent, awarded it judgment in the sum of $42,699.98 and imposed a constructive trust and/or equitable lien on Lot 71, Townhomes at El Dorado.

2. The courts in Arizona follow the Restatement of Law in the absence of contrary authority.

## ISSUES PRESENTED BY APPELLANTS

Appellants contend the trial court erred in (1) not giving res judicata effect to the Mexican court judgment; (2) applying the law of Arizona in determining the validity of the decedent's bequest to the Rotary Club, and (3) imposing a trust on the townhouse.

## RECOGNITION OF THE MEXICAN JUDGMENT

■ It is clear that the Arizona courts are not required to give full faith and credit to judgments of foreign nations. *Multibanco Comermex S.A. v. Gonzales H.*, 129 Ariz. 321, 630 P.2d 1053 (App.1981). Under what conditions will we recognize foreign nation judgments? Restatement (Second) Conflict of Laws § 98 (1971) is our guide in this respect.[2] It states:

A valid judgment rendered in a foreign nation after a fair trial in a contested proceeding will be recognized in the United States so far as the immediate parties and the underlying cause of action are concerned.

Comment *c* to the above statement of the Restatement sets forth the conditions to recognition of a foreign nation judgment and states that such judgment will not be recognized in the United States unless the court is convinced that the foreign court had jurisdiction and that:

"there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it is sitting, or fraud in procuring the judgment...." *Hilton v. Guyot*, 159 U.S. 113, 202, 16 S.Ct. 139, 158, 40 L.Ed. 95 (1895).

*Bank of America v. J. & S. Auto Repairs*, 143 Ariz. 416, 694 P.2d 246 (1985).

Restatement (Second) Conflict of Laws, § 98, Comment *c* at 298. This brings us to this question. Was there an opportunity for a full and fair hearing in the Mexican court? If not, then the trial court correctly disregarded the Mexican judgment. Resolution of this issue depends upon the authority of Insunza who accepted on behalf of the Rotary Club of Tucson the summons to appear at the hearing which was to establish the club's legal capacity to be a legatee.

An attorney, solely by reason of his capacity as attorney, does not thereby become his client's agent authorized by appointment to receive service of process. What is necessary is that it appear that the attorney was authorized, either expressly or impliedly, to receive service of process for his client, and if such agency is to be implied, it must be implied from all circumstances accompanying the attorney's appointment which indicate the extent of authority the client intended to confer. *United States v. Bosurgi*, 343 F.Supp. 815 (S.D. N.Y.1972). Here, the power to accept service of process cannot be implied from the limited special powers given to Insunza by appellees.

### THE LAW DETERMINING THE VALIDITY OF THE TRUST

■ Appellants contend that in determining the capacity of appellees to accept a legacy, the court should look to the law of Mexico and not to that of the State of Arizona. There is no doubt that in Arizona the appellees were competent to act as trustee for the charitable trust created in the will. Cf. *In the Matter of the Estate of Kidd*, 106 Ariz. 554, 479 P.2d 697 (1971). Appellants have not provided us with any Mexican law which disqualifies the Rotary Club of Tucson from acting as trustee of the testamentary trust. We therefore presume the Mexican law to be the same as ours. See *Avila v. Chamberlain*, 119 Ariz. 369, 580 P.2d 1223 (1978). The trial court did not err in applying Arizona law.

### THE IMPOSITION OF A CONSTRUCTIVE TRUST

■ The trial court imposed both a constructive trust and an equitable lien on the house. There is a difference between these two remedies. Under a constructive trust the appellants hold the title to the townhouse for appellees. Appellees have a judgment for $42,699.98. If the townhouse is worth $150,000 appellees will make a profit of $107,300.02.

There are different results from an equitable lien. Appellees can foreclose this lien and any proceeds from the sale in excess of their judgment goes to the appellants. If the proceeds are insufficient, appellees can obtain a personal judgment against appellants for the balance.

Appellants used the majority of the proceeds they received from the Palm Tree Drive property to pay off an outstanding overdue mortgage on the townhouse which was also part of the Chaprales estate. They contend that they acted in a good faith belief pursuant to what they thought was a valid Mexican judgment. Appellees do not dispute the fact that appellants acted in such good faith belief. The Restatement of Restitution, § 203 (1937) states:

> Where a person converts the property of another without notice of the facts which make him a converter and being still without such notice exchanges it for other property, the other is entitled to an equitable lien upon the property received in exchange to secure his claim for restitution, but is not entitled to enforce a constructive trust of the property.

The reason for the Restatement rule is set forth in Comment *a:*

> Where the converter is a conscious wrongdoer, he can be compelled to surrender any profit which he makes by a disposition of the claimant's property, and not merely to restore to the claimant the value of his property, since if he were permitted to keep the profit there would be an incentive to wrongdoing, and compelling him to surrender the profit operates as a deterrent upon the wrongful disposition of the property of others.... This reason is not applicable to persons who are not conscious wrongdoers. A person who innocently con-

verts the property of another is liable to the other for the value of the property converted, and if through the disposition of this property he acquires other property, the other can enforce an equitable lien upon the property so acquired as security for his claim against the converter for the value of the property converted, and if the property so acquired is of less value than the property converted, the other can hold the converter personally liable for the balance of his claim. If the property so acquired is of greater value than the property converted, the other cannot reach the profit by enforcing a constructive trust of the property so acquired. The owner of the property converted is entitled to be made whole but not to reach the profit.

The trial court erred in declaring a constructive trust but did not err in declaring an equitable lien on the townhouse.

## THE CROSS–APPEAL

 While the appellees' pleadings in the trial court asked for the imposition of an equitable lien, they did not in their original or amended pleadings ask that the lien be foreclosed. Due to this failure the trial court refused to order such foreclosure.

Appellees contend the trial court erred because now they will have to file another action to foreclose. See *Wolfswinkel v. Superior Court in and for Gila County*, 145 Ariz. 154, 700 P.2d 852 (1984). We agree.

The final judgment shall grant the relief to which a party in whose favor it is rendered is entitled even if such party had not demanded such relief in his pleadings. *Thompson v. Harris*, 9 Ariz.App. 341, 452 P.2d 122 (1969). Rule 54(d), Rules of Civil Procedure, 16 A.R.S. Being entitled to an equitable lien, appellees were also entitled to an order directing foreclosure of their lien.

That part of the judgment declaring the constructive trust is vacated and set aside. The balance of the judgment is affirmed and the case is remanded to the trial court with directions to enter its order directing foreclosure of the lien.

LIVERMORE, P.J., and ROLL, J., concur.